ARCHWAY MOTORS, INC. *v.* WALTER F. HERMAN

[No. 415, September Term, 1977.]

*Decided October 20, 1977.*

The cause was argued before MORTON, MELVIN and WILNER, JJ.

*Charles F. Obrecht, Jr.*, for appellant.

*William R. Lenhard* and *Edward L. Zamarin* for appellee.

WILNER, J., delivered the opinion of the Court.

The question before us is whether the Circuit Court of Baltimore City erred in refusing to grant specific performance and ancillary monetary relief upon finding a breach of a contract for the sale of real estate. We think it did.

The appellant, Archway Motors, Inc., owned two parcels of real estate in Baltimore City that it wished to sell. One parcel appears to be unimproved; the other is improved by 92 brick garages. We are concerned with the second, or improved, parcel.

Archway employed A. J. Billig & Co., auctioneers, to sell the two parcels at public auction. Billig advertised the sale in The Daily Record on March 4, 1975, which was the same day as the auction. The advertisement generally described the property, gave notice of the time and place of the sale, and stated:

> "TERMS OF SALE: A cash deposit or certified check for $500.00 on each parcel at time of sale. Balance to be paid in cash in 30 days. All adjustments as of date of sale. Cost of all documentary stamps and transfer taxes to be paid by purchaser. Time is of the essence."

The auction was conducted on the premises in accordance with the notice. Appellee, Walter Herman, who happens to

be the real estate, business, and finance editor of the Baltimore News American, attended the auction and was the successful bidder for the improved parcel. To evidence his purchase, he signed the following contract:

"I, Walter F. Herman, have this day purchased at Public Auction for the price of $675 the Fee Simple Garage Properties situated in rear of 3500 W. Franklin Street, and 500 block Edgewood St. — in rear of 3500 block Edmondson Ave., more fully described in the Daily Record advertisement of March 4, 1975, from Archway Motors, Inc., Owners, of which a deposit of Five Hundred ($500.00) Dollars has been paid. Balance of purchase money to be paid IN CASH within 30 days. Time is of the essence. All rents, taxes, and expenses to be adjusted to date of sale. Subject to any and all agreements, restrictions, covenants and easements of record affecting the same, if any. All documentary stamps to be borne by purchaser. All transfer taxes to be paid by purchaser. The Daily Record Advertisement of March 4, 1975 is hereby incorporated herein."

On March 26, 1975, Archway's president, Alan Abramson, wrote to appellee at his home address reminding him of the contract, and stating:

"Under the terms of the contract the balance of the purchase price is to be paid and final settlement is to occur within 30 days; this, of course, means by April 4, 1975. Time is of the essence."

On either April 3 or April 4, appellee called Mr. Abramson and, according to Abramson, acknowledged receipt of the March 26 letter and said that he was ready to settle for the property. Abramson suggested that appellee have an attorney handle the settlement. Appellee said that that would not be necessary, and instead asked Abramson to have the deed prepared and sent to him. Within ten days, Abramson executed and acknowledged a deed for the

property, which, along with a settlement sheet showing a balance due Archway of $284.78, he mailed to appellee at his home address. Abramson and his secretary testified that these documents were duly deposited in the U. S. mail, properly addressed, on April 14, 1975. Appellee denied ever receiving them.

Nothing further occurred until six months later. On August 14, 1975, Archway received a formal notice from the City Department of Housing and Community Development that the condition of the subject property violated various sections of the City Building Code, and that these violations would have to be corrected either by razing or rehabilitating the garages. This was the first notice Archway had of any violations. It responded to the notice by letter dated August 18, in which it informed the Department that the property had been sold to appellee.

After apparently checking the Land Records and finding that the deed to appellee had not been recorded, the Department, on September 8, 1975, warned Archway that unless the violations were corrected, legal action and possible penalties would ensue. This was no idle threat; for, on December 4, 1975, Archway was summoned into the District Court and tried for the violations. The court entered probation before judgment pending a determination of ownership of the property, conditioned upon Archway placing the garages in a condition satisfactory to the Department, short of actual razing or rehabilitation.

To comply with this condition, Archway claims to have expended $2,507.96 for materials and labor, the labor being supplied by some of Archway's regular employees. It also was required to pay the 1976-77 real estate taxes on the property, amounting to $513.13.

On January 16, 1976, Archway filed a Bill of Complaint, in which it asked for an order requiring appellee to record the deed and for a judgment for $25,000 damages. In the alternative, the Bill asked that, if the original deed were lost or destroyed, the court order appellee to accept and record a new deed, to be effective April 15, 1975, and for "such other

and further relief as the nature of this cause may require." For the next two months, efforts were made to serve appellee at both his home and his place of business, without success. Summonses were issued on January 16, February 2, February 23, and March 16, all of which were returned "non est." Finally, on March 23, appellee was served at his home by a private process server. He failed to respond to the summons; and on May 6, 1976, a Decree Pro Confesso was entered against him, notice of which was sent to him at his home by the Clerk of the Court.

On May 19, 1976, appellee sent a letter to the Clerk on News American stationery in which he stated that he had never been served with any papers, didn't know how a decree could be entered, and that "if this is the way the Baltimore City courts handle things of this sort, then it bears investigation." He signed the letter as "Business Editor". The Clerk responded to appellee's letter, advising him of the Return of the Private Process Server and inviting him to view the file during normal court hours.

At this point, appellee retained counsel, who, on September 27, 1976, moved to set aside the Decree Pro Confesso. His motion was granted, and on October 13, 1976, ten months after the Bill of Complaint was filed, appellee filed an Answer to it. The case was tried December 2, 1976.

In his Answer, and at trial, appellee asserted that he had never received the deed from Archway, and that the contract was void because of a misrepresentation as to the potential use of the property.

The chancellor rejected the first defense, correctly, we think, on the basis that whether or not appellee received the deed was irrelevant. He had entered into the contract; and, as buyer, it was his obligation to proceed with settlement.

As to the claim of misrepresentation, appellee testified that, in an attempt to induce him to bid on the property, Mr. Billig had told him that (1) there were no "violations" on the property, and (2) he could rent out "the center sections" to

contractors for $200 per month. Mr. Billig denied making any such representations. He testified:

> "We said the properties were sold as is, where is and how is. We guaranteed the title to be free and clear and merchantable."

With respect to the question of "violations", the fact is that, at the time of the auction, there had been no violation notices issued; and thus, even if such a representation had been made, it would have been true. Moreover, in testifying about his alleged conversation with Mr. Billig, appellee stated that he had told Billig, "I don't believe with the condition here there are no violations; it's a little strange."

On the question of whether the garages could be rented commercially, appellee stated that "several months later" he checked with the Zoning Board and discovered that the garages could only be used for residential purposes. This was not persuasive to the chancellor, however, for, in ruling on the issue of misrepresentation, he stated:

> "I can't believe he was misled or induced, as he characterized it. . . . I think what he did was decide after he made it [the contract] that it was a bad deal, and notwithstanding that he wasn't going to go ahead and invest any more money into what he considered a bad deal. Perhaps he acted hastily, perhaps not. That is not before me. The point is he is certainly more than an initiated [sic, uninitiated?] buyer that normally attends these sales. He can stand on a par with all the professional real estate agents as far as I'm concerned. I am not persuaded one way or another that he was misled, induced or ill-advised or there was any misrepresentation to him."

Thus, in effect, the chancellor found the contract to be valid and binding on appellee, and his breach of it to be legally inexcusable. The evidence clearly supports those findings.

The chancellor then stated:

"The question in my mind is really what relief to afford here. I don't believe that Mr. Abramson should be in a position of being continually subject to Housing Court violations. Perhaps that's why his counsel is strenuously urging the Court to decree specific performance of the contract of sale. On the other hand, I don't know whether decreeing specific performance in the case of Mr. Herman would, in fact, accomplish the desired result. It is not a matter of simply appointing a trustee, and I don't feel that a decree of specific performance, if in fact it is going to be ignored, would accomplish much. I wouldn't want to have to face the prospect of holding a contempt hearing on Mr. Herman. I don't enjoy that sort of thing."

From this and other colloquy between the chancellor and counsel for appellant, it is evident that the chancellor assumed that appellee would simply ignore a court decree of specific performance; and that, as a result, either the decree would be a "nullity", or that the court would be put to the distasteful task of enforcing it through contempt proceedings.

On that basis, the chancellor denied the request for specific performance. With respect to damages, he rejected Archway's request to be compensated for the $2,507 expended to that point to satisfy the Department of Housing and Community Development, and refused to consider any future cost that would be required to correct the violations. Instead, on April 25, 1977, nearly five months after the hearing, the chancellor issued an Order that $1,045.18 (including the $500 deposit) be paid by appellee as damages for his breach. The Order contains no breakdown or explanation of how this amount was calculated.

In this appeal, Archway contends that it was entitled to specific performance, and that the chancellor abused his discretion in refusing to grant it. Additionally, Archway claims that it is entitled to ancillary compensation for losses

caused by appellee's delay in performance, measured from April 4, 1975, to the date of actual performance, including reimbursement for all sums expended by Archway to comply with the order of the District Court.

## I.

### *Specific Performance*

Specific performance is considered an extraordinary equitable remedy which may be granted, in the discretion of the chancellor, where more traditional remedies, such as damages, are either unavailable or inadequate.

This extraordinary remedy has been particularly recognized as appropriate where the contract is for the sale of land because of the presumed uniqueness of land itself, no parcel being exactly like another. Although it has most frequently been granted at the behest of the buyer to compel the seller to convey the land, the criteria justifying its use have also been found operative where the seller is its seeker. Thus, the *Restatement of Contracts* § 360 (1932), states:

"Damages are regarded as an inadequate remedy for the breach of a promise

(a) to transfer any interest in specific land, or
(b) to buy and pay for such an interest, so long as the transfer has not yet been made;

and specific performance will be decreed, subject to the rules stated in §§ 359-380."

The rules in §§ 359-380 are not applicable to this case, and thus the statement stands as expressive of the law. In Comment c. to § 360, the authors discuss the inadequacy of damages as a seller's remedy, as follows:

"Before conveyance has been made by the vendor his remedy in damages is not an adequate one. He can not get judgment for the full price, because he still has the land. His damages are usually measured by the contract price less the value of the land retained; but the land is a commodity that has

no established market value, and the vendor may not be able to prove what his real harm will be. Even if he can make this proof, the land may not be immediately convertible into money, and he is deprived of the power to make new investments. Prior to getting a judgment, the existence of the contract, even though broken by the vendee, operates as a clog on salability, so that it may not be possible to find a purchaser at any fair price. In addition, the fact that specific performance is available to the vendee is of some weight, because of the rule as to mutuality of remedy (see § 372 (2))."

In general support of the *Restatement* rule, and offering additional reasons why specific performance is, or should be, available to the seller, is Corbin, *On Contracts*, § 1445 (1964). *See also* 81 C.J.S. *Specific Performance*, § 77c (1977); Pomeroy *Specific Performance of Contracts*, § 6 (3d ed. 1926).

That specific performance is not only available but a preferred remedy to a contract seller of land is firmly rooted in the law of Maryland. In *Maryland Clay Co. v. Simpers*, 96 Md. 1 (1902), the court stated, at pages 5 and 6:

"If the purchaser may compel the vendor by such a proceeding to convey the land, there ought to be no reason why the vendor cannot require the purchaser to pay the stipulated price and accept a conveyance. One of the essential requisites of a contract that may be enforced is mutuality. . . .

"It can scarcely be said that a contract is mutual — that it operates alike on both parties — when one of them to it may invoke a remedy for its non-fulfillment which is denied to the other for a similar breach. If the purchaser may invoke the jurisdiction of equity, as he undoubtedly may, because he is entitled to have the specific land he has bought; then the vendor is equally entitled to appeal to the same jurisdiction to compel the

purchaser to take the land and to pay the price agreed to be paid."

Continuing, the court concluded, on pages 6 and 7:

"In other words, if one of the parties to a contract for the sale of land has the right to its specific execution, then both have that right; and if one has not that right then neither has the other. This remedy has been applied in Maryland when invoked by the vendor of land. *Wilson v. Blount*, 93 Md. 30; *Canton Co. v. B. & O. R. R. Co.*, 79 Md. 424."

The court dismissed the contention that a seller's right to damages barred the use of specific performance, noting, on pages 7 and 8:

"It is the established doctrine that specific execution of a contract will not be decreed where there is an adequate and complete remedy at law by way of compensation in damages. . . . But it is equally well settled in Courts of equity 'that in general the legal remedy of damages *is* inadequate in all agreements for the sale or letting of land, or of any estate therein; and therefore in such class of contracts the jurisdiction (of equity) is always exercised, and a specific performance granted, unless prevented by other and independent equitable considerations which directly affect the remedial right of the complaining party.' 1 Pom. Eq., sec. 221. The reason for this rule is obvious. The measure of damages for a refusal to take the land and to pay the price agreed to be paid would, in an action at law, be the difference between the real value of the land sold and the contract price. . . . Now, the difficulty of proving the actual value of the land makes the standard by which the vendor's damages are to be measured exceedingly uncertain. The [buyer] has not taken possession of the land and hence the vendor cannot proceed at law for the recovery of the purchase money or

declare specially on the contract of sale, but would be remitted to an action for a breach of the contract. In this situation, confronted in a Court of law by a standard as a measure of damages which would be uncertain in its result for such a breach, there can be no adequate remedy for the vendor other than in a Court of Equity where the purchaser may be decreed to accept a conveyance and to pay the amount which he has contracted to pay."

Some of these concepts were succinctly reaffirmed in *McKeever v. Realty Corp.*, 183 Md. 216 (1944), where the Court said:

"Where land, or any estate therein, is the subject matter of an agreement, the equitable jurisdiction is firmly established. Whenever a contract concerning real estate is in its nature and incidents entirely unobjectionable, it is as much a matter of course for a court of equity to decree its specific performance as it is for a court of law to give damages for its breach. 4 Pomeroy, Equity Jurisprudence, 5th Edition, Sec. 1402. The reason for the rule is that the measure of damages in a court of law for breach of a contract for conveyance of land is uncertain, and there can be no adequate remedy other than in a court of equity where specific performance can be decreed."

Finally, with respect to the adequacy of damages, if the rules laid down in these cases are not clear and controlling, Md. Ann. Code art. 16, § 169 is. It provides:

"No court shall refuse to specifically enforce a contract on the mere ground that the party seeking its enforcement has an adequate remedy in damages, unless the party resisting its specific enforcement shall show to the court's satisfaction that he has property from which such damages may be made, or shall give bond, with approved

security, in a penalty to be fixed by the court, to perform the contract or pay all such costs and damages as may, in any court of competent jurisdiction, be adjudged against him for breach or nonperformance of such contract."

There is nothing in the record to show compliance with the conditions of this statute by appellee. The purpose of the statute, which was first enacted in 1888, was defined by the Court of Appeals in *Neal v. Parker*, 98 Md. 254 (1904), as follows:

"It was doubtless the policy of the Legislature in adopting it to do away with the technical defenses to proceedings in equity instituted to compel parties to live up to their undertakings, and it was designed to preclude individuals who had entered into binding contracts from repudiating them at pleasure by merely electing to pay such damages for their breach as a jury in an action of law might assess."

It is true, of course, that the question of whether specific performance should be decreed, even with respect to a contract for the sale of land, is within the sound discretion of the chancellor. However, as has been stated on numerous occasions, by both the Court of Appeals and this Court:

"The exercise of the court's discretion. . . . must not be arbitrary and is controlled by established principles of equity. Where a contract for the sale of real estate is fair, reasonable and certain in all of the terms, it is as much the duty of a court of equity to decree specific performance as it is for a court of law to award damages for breach of contract."

*Boyd v. Merc.-Safe Dep. & Trust Co.*, 28 Md. App. 18, 22 (1975) and cases cited therein. *See also Housing Eng. Co. v. Andrew Co.*, 184 Md. 290 (1945).

What the chancellor had before him was a contract that was clear, certain, fair, and reasonable; and, having rejected

factually the defense of misrepresentation, without equitable defense. The potential hardship to appellee occasioned by the violation notices issued subsequent to the execution of the contract, and which were not extant at the time the parties made their agreement, is not a bar to specific performance. As the Court held in *Glendale Corp. v. Crawford*, 207 Md. 148, 154 (1954):

> "The fairness or hardship of a contract is to be judged as of the time when it was made and no subsequent change which may make it less beneficial to one of the parties is material unless the change is in some way the fault of the party seeking its specific execution."

*See also* Pomeroy, *supra*, § 186.

There is no evidence here that the "change" was the "fault" of Archway. It was, in fact, only a confirmation of what appellee said he suspected when he examined and purchased the property.

It is clear that the only reason the chancellor denied Archway the specific performance it requested was his suspicion that appellee would ignore the decree and his concern over what may be required to enforce it. This is not a proper reason to withhold a remedy that, in this type of case, has been held to be a "matter of course", a "duty". In the first place, it was not appropriate for the chancellor to have assumed that appellee would ignore the decree. Appellee is apparently a sophisticated person who holds a responsible position in the community. Whatever may have been his difficulties in receiving letters, deeds, and summonses, there was no evidence before the chancellor that he would ignore a court decree. That he *might* do so is hardly a reason to deny appellant the relief to which it was entitled. Maryland Rule 685 provides ample methods of enforcing the decree, which are no more distasteful in this case than in any other.

As a positive defense, appellee claims that the contract was no longer operative in that settlement was called for by April 4, 1975, and the contract provided that

time was of the essence. Thus, he says, since Archway failed to convey the property to him by that date, the contract expired and he is no longer bound under it. The chancellor apparently found no merit in this argument, and neither do we.

Although settlement was called for by April 4, and time was stated to be of the essence, a fair reading of the contract in light of the general practice prevailing with respect to real estate transfers, indicates that the initial obligation was on appellee to prepare a deed and to tender the balance of the purchase price. Thus, any default in concluding the settlement at the appointed time was his, and not Archway's. This alone would have permitted Archway to seek specific performance.

What the record indicates, however, is that, by virtue of the telephone conversation between the parties on April 3 or 4, they mutually agreed to extend the time for settlement until Archway could prepare and execute the deed. Archway consented to assume a responsibility that was properly appellee's, which it discharged with reasonable dispatch. The entire delay, without question, was due to appellee, who may not now convert it to his advantage.

## II.

### Ancillary Monetary Compensation

As noted earlier, in its Bill of Complaint, Archway asked for a judgment for damages or, in the alternative, what has become a standard prayer for such other and further relief as the nature of the cause may require. Proceeding apparently under this umbrella request, appellant asserts that it is entitled, as ancillary relief to specific performance, to be compensated for its losses and expenses attributable to appellee's delay in performance. We agree.

It has long been recognized in Maryland and generally throughout the country, that, in decreeing specific performance, a court of equity may also award ancillary monetary damages to compensate the plaintiff for his losses arising from the defendant's breach. See *Walzl v. King*, 113

Md. 550 (1910); Pomeroy's *Specific Performance of Contracts, supra,* § 474; Miller's *Equity Procedure,* § 673. It is also clear that such relief may be granted under a general prayer. *Miller v. Talbott,* 239 Md. 382 (1965); *Powell v. Young,* 45 Md. 494 (1877). The question is the proper measurement of the monetary compensation.

In *Bernardini v. Stefanowicz Corp.,* 29 Md. App. 508 (1975), we quoted with at least tacit approval the following language from *Ellis v. Mihelis,* 384 P. 2d 7 (Cal. 1963):

> "The compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages. The complainant affirms the contract as being still in force and asks that it be performed. If the court orders it to be performed, the decree should as nearly as possible require performance in accordance with its terms. One of the terms is the date fixed by it for completion, and since that date is past, the court in order to relate the performance back to it, gives the complainant credit for any losses occasioned by the delay and permits the defendant to offset such amounts as may be appropriate. The result is more like an accounting between the parties than like an assessment of damages."

To the same effect, we noted, was an annotation found in 7 A.L.R.2d 1204.

This is the prevailing law; it is required by the very theory upon which specific performance is itself based. Accordingly, Archway is entitled to be compensated by a monetary award for whatever losses and expenses it has, in fact, incurred that are properly attributable to appellee's delay in performance.

We are in no position, on the record before us, to determine what the amount of a monetary award should be. Indeed, as appellee has yet to perform the contract, the total compensable losses may not be fully ascertainable. It would

seem clear, however, that Archway is entitled to the unpaid balance of the purchase price plus reimbursement for taxes on the property from and after March 4, 1975, the date of the contract, that it has paid, and the actual and reasonable expenses that it has incurred in order to comply with the order of the District Court.

We therefore remand the case to the Circuit Court of Baltimore City for the purpose of (1) entering a proper decree of specific performance, and (2) determining the proper amount of ancillary monetary compensation due to Archway and entering an appropriate order therefor.

> *Reversed and remanded for further proceedings in conformance with this opinion. Appellee to pay the costs.*