875 A.2d 778

**Jamil M. AZAT**

v.

**Giuseppe FARRUGGIO.**

**No. 1308, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 7, 2005.

540

Damon K. Bernstein, Rockville, for appellant.

David W. Lease (Smith, Lease & Goldstein, on brief), Rockville, for appellee.

Panel DAVIS, HOLLANDER, JOHN J. BISHOP (retired, specially assigned), JJ.

DAVIS, J.

Appellee, Giuseppe Farruggio, sued his commercial landlord, the appellant Jamil Azat, in the Circuit Court for Montgomery County, seeking specific performance of an option to purchase the leased property and consequential damages flowing from appellant's alleged breach of contract. The trial court granted specific performance after a three-day bench trial, ordering, among other things, that appellant convey the property to appellee, but the court declined to award appellee consequential damages.

Appellant noted this appeal, presenting three questions for our review. Appellee filed a cross-appeal, presenting one question; we have rephrased their questions as follows:

I. Did the trial court err in finding that the separation agreement between appellee and his former wife assigned to appellee his former wife's rights in the option to purchase the leased property?

II. Did the trial court. err in ruling that the appellee's delay in settling on the property was excused by the existence of a building encroachment?

III. Did the trial court err by determining that the lease's "as is, where is" clause did not apply to the location of the improvements on the property at issue?

IV. Did the trial court err in declining to award consequential damages to appellee?

Finding no error, we shall affirm the judgment.

## BACKGROUND

On December 31, 1997, appellant leased to appellee and his former wife the commercial property at 430 North Frederick

Avenue, in Gaithersburg, Maryland. The lease had a term of ten years, and included an option for the tenants to purchase the property between the beginning of the fourth and end of the fifth year, for a price of $965,000.

In the purchase option paragraph, the lease stated: "This option shall automatically lapse if not timely exercised or if Tenant shall fail to close on the purchase during the fifth (5th) year of the tenancy," which, according to the parties', would have been January 31, 2003. The option required that the tenant give appellant at least ninety days' notice in exercising the purchase option, and the parties' agreement stipulated, "Time is of the essence for purposes of this [purchase] option." Finally, the purchase option clause stated that, if it were exercised, "the Leased Premises shall be delivered in 'as is, where is' condition," and, "the Leased Premises shall be conveyed with good and merchantable title and free of any liens or debts of the Landlord."

Appellee operated an Italian restaurant at the leased premises, through a business called Italy Italy, Inc. That business was not the lessee of 430 North Frederick Avenue, and had no legal interest in the property; appellee and his former wife were the tenants. The couple separated in November 2000, and on June 21, 2001, they signed a Separation and Property Settlement Agreement.

Nowhere in that Agreement did the couple specifically refer to their lease or the option to purchase the property. In the Agreement's preamble, the parties did expressly declare that they were,

> desirous of amicably adjusting and fully, finally and completely, settling all rights and obligations arising from the state of matrimony between them, all property rights they may have in the estates of each other, including the rights of dower and curtesy, all claims and rights of custody, alimony, maintenance and support, and all other rights, claims, relationships or obligations between them arising out of their marriage or otherwise, and to record their understanding.

The Agreement also provided for the settlement of the couple's business interests:

> The Husband owns an interest in Italy Italy, Inc.[;] Italpasta, Inc.; GMREA, Inc.; Jojo's L.L.C.; Pizza Re, L.L.C.; GVC and Leopardo Partnership. The Wife waives all of her right, title and interest in the aforesaid business interests. The Wife shall execute any documents necessary to transfer her interest in said businesses to the Husband. *The Husband shall assume sole responsibility for all liabilities and expenses in connection with the businesses, and shall indemnify, defend and hold the Wife harmless thereon. The Husband shall take all steps necessary to release Wife from any and all debts and personal guarantees associated with said business,* including but not limited to obtaining releases from financial institutions.

(Emphasis added.) Finally, the Agreement included a section disposing of property that the couple owned in the United States and in Italy, which made no mention of the couple's lease, and the Agreement included a standard integration clause.

Although both he and his former wife were the tenants on the lease, appellee purported to exercise the purchase option individually on December 11, 2001. By counsel (not his counsel on appeal), he wrote to appellant stating that he wanted to buy the property, making no mention of his co-tenant. Appellant responded on December 19, 2001, also by counsel, confirming receipt of appellee's notice and "pledg[ing] . . . cooperation with [appellee] in connection with the upcoming sale."

Then, by a March 1, 2002 letter, appellant's counsel notified appellee's counsel that appellant had been contacted on or about July 9, 2001 by the owners of a lot adjacent to 430 North Frederick Avenue, on which a Kentucky Fried Chicken franchise was operated. The adjacent lot owners contended that appellant's building at 430 North Frederick Avenue encroached upon the adjacent lot by a depth of two and a half feet, for a length of fifty-five feet.

On March 7, 2002, appellee's counsel responded by letter to appellant's counsel, stating that, in his view, the encroachment "is potentially a substantial problem unless we can obtain an easement from the adjacent landowner." That letter also related that a representative of the title company appellee proposed using had contacted appellant's mortgagor to determine the outstanding balance on the mortgage; to appellee's surprise, the mortgagor told the title company representative that appellant had told the mortgagor that he "was not going to sell the property" because "there were too many 'logistical' problems for him to proceed with the sale." The March 15, 2002 response from appellant's counsel addressed neither of these issues.

On March 21, 2002, appellee's counsel again wrote to appellant's counsel, this time stating, "assuming that what is shown on the Kentucky Fried Chicken site plan is correct, then [appellant] cannot convey good title to [appellee]." He asked appellant's counsel to consult with appellant about how he proposed to resolve the dispute and suggested that one of the attorneys contact the adjacent landowner to try to procure an easement from the adjacent landowner. Appellant's counsel responded by a letter dated March 25, 2002, apparently contending that the "as is, where is" clause of the purchase option absolved appellant of any responsibility for the encroachment. Appellee's counsel refuted that claim in an April 18, 2002 letter to appellant's counsel, adding:

> Since you have elected not to take steps to mitigate your damages by contacting [the adjacent landowner] about an easement to permit the encroachment of the restaurant building, I have done so. We may be fortunate and they may grant an easement without any cost. If not, the cost of obtaining the easement will be the purchaser's measure of damages for your client's failure to deliver marketable title to the property.

After five and a half months of negotiation, appellee's counsel updated appellant's counsel on his efforts in a November 5, 2002 letter. He wrote:

It now appears that we are very close to reaching an agreement with [the adjacent landowner] and with his Tenant. It looks like it will cost us some $15,000–$17,000 to obtain the necessary consents from the neighboring owner and tenant. We will look to [appellant] to pay that sum as well as the other damages incurred by our client as a result of [appellant's] inability to deliver good title. . . .

When we last discussed this issue, you took the position that the encroachment of [appellant's] restaurant building on the [adjacent] property was not a cloud on [appellant's] title and he disclaimed any responsibility for his construction error. That defies common sense and runs contrary to the position taken by all of the major title insurance companies who have addressed the issue. The encroachment renders [appellant's] title unmarketable.

I am writing now to request that you reconsider your position on this matter so we can reach an agreement and proceed to settlement. This problem will not go away. If we cannot reach an agreement, then we will file suit to recover the sums incurred to make [appellant's] title marketable. We will prevail in the litigation and [appellant] will be liable for our client's legal fees and court costs as well as his own. This makes no sense, but we are prepared to go that route if your client makes it necessary to do so.

Appellant's counsel responded a month later, on December 4, 2002, repeating his position that appellant bore no responsibility to resolve the encroachment. Regarding the proposed easement that appellee's counsel had negotiated, appellant's counsel stated that appellee "has no authority to negotiate or interfere with [appellant's] property rights on this issue." This last statement contradicted his earlier comment that appellee could "seek to obtain an easement at his expense." Finally, appellant's counsel observed:

I note that [appellee] is obliged to purchase the property upon ninety (90) days['] advance notice and that we are now nearly a year past the time in which this notice was given. As you know, the lease further provides that [appellee's] option to purchase the property shall automatically lapse if

he fails to close on the acquisition during the fifth year of his tenancy. Please be advised that [appellant] intends to strictly enforce the terms of the [appellee's] lease agreement in this regard.

Appellee's counsel responded on December 31, 2002, reiterating his position, and adding, in closing: "It appears we will be in court on this matter in any event so [appellant] can see if he can convince a judge that he can rely on his own default as a basis for saying that his tenant has not acted on a timely basis."

On January 30, 2003, appellant's counsel again wrote to appellee's counsel, contending that appellant stood "ready, willing and able to convey [the] property to" appellee, and he was merely awaiting notice of the time and place for settlement. Then, after appellee finally secured the easements he believed necessary to clear title to the property and so notified appellant's counsel, on May 2, 2003, appellant's counsel wrote to appellee's counsel that "[appellee] has long since forfeited the right to purchase the property by virtue of his several material breaches of the parties' lease agreement," particularly, "[appellee's] failure to close prior to the expiration of the fifth year of his tenancy, January 31, 2003."

By a letter of June 23, 2003, appellee's counsel notified appellant's counsel that settlement was scheduled for the afternoon of June 26, 2003. Appellant did not appear at that time, and appellee filed his complaint in the circuit court on September 24, 2003. After appellee filed suit, he and his former wife executed a document captioned Assignment of Interest in Lease on March 1, 2004. The 2004 Assignment expressly confirmed the parties' intent that the 2001 Separation and Property Agreement assigned to appellee all rights and liabilities under the lease at issue here.

The case was tried from June 14 to June 18, 2004. The trial judge found that the 2001 Separation Agreement "is ambiguous with respect to whether [appellee's] wife assigned her interest in the option under the lease to [appellee] through the separation agreement." Therefore, the court admitted and

considered parol evidence on the issue of whether the 2001 Agreement was intended to effect such an assignment. This evidence included the former co-tenants' testimony that it was their intent that the 2001 Agreement assign all the former wife's interests in the lease to appellee and the 2004 affirmation of their intent to effect such an assignment. "Based upon that," the trial court found "that it was the intention of the parties that the wife transfer her interest under the lease and the Court [found] that it was, in fact, transferred by virtue of that separation agreement." [1]

Regarding the encroachment, the court found that it did exist, and that appellee's lender would not have extended financing on the transaction unless that cloud on the title were resolved. The trial judge found that the reason settlement did not occur prior to the end of the fifth year of the lease was that appellee was required to obtain an easement to establish marketable title, and that his efforts cost roughly $15,000.

The court concluded that the encroachment had rendered title unmarketable. The court did not apply a *per se* rule, i.e., that any encroachment onto a neighboring property would always render title unmarketable; rather, the court considered the following factors in reaching its conclusion:

- the adjoining landowner and tenant only consented to a temporary easement, effective until the encroaching building were demolished or substantially renovated;
- appellee's lender would not finance his transaction unless the encroachment were resolved;
- the adjoining landowner and tenant required a total of approximately $15,000 to grant even a temporary easement;

---

1. The court found, in the alternative, "that were it not transferred under the [separation] agreement as written, that it was the intention of both parties that it be so transferred and that it was, in fact, a mutual mistake that the agreement did not contain the language transferring the interest, and would reform the contract...." As will become evident from our discussion *infra*, we do not believe reformation was the appropriate legal precept upon which to base the decision to order specific performance.

• appellee, whose lawyer, the court noted, referred to as a "cheapskate," agreed to part with $15,000 plus attorney's fees to secure the easement.

The court then concluded that the "as is, where is" clause "refers only to the condition of the building and ... did not extend to the location of the building on the lot."

The court found that appellant could have cleared the title by expending roughly the same amount of money, and that appellant had a duty to do so, but breached this duty. Further, the court found that appellant's breach was the cause of the delay in closing on the transaction before the end of the fifth year of tenancy. Thus, the court found appellee's failure to close by that time was excused. The court then ordered specific performance.

The court awarded appellee $1,863.39 in "incidental damages," representing appellee's cost of obtaining a survey to procure the easement. The court declined to award "delay damages," however, reasoning that even if appellant had performed as he was obligated to perform, the same delay would have resulted from his attempts to procure the easement, and thus, the court reasoned, the delay damages did not result from appellant's breach.

## LEGAL ANALYSIS

In reviewing the trial judge's decision in this case, we will "review the case on both the law and the evidence," but we will "not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c).

### I

Appellant first contends that the trial court erred in finding that appellee's former wife assigned to appellee her interest in the lease and its option to purchase the premises. This argument implicitly assumes that appellant could not have unilaterally exercised the option in the absence of his former

wife's authorization and, because appellee does not challenge the assumption, we will also assume that to be the case.

■ Appellant first argues that parol evidence should not have been admitted to clarify the Separation Agreement's meaning because the Agreement unambiguously did not include a provision assigning the purchase option to appellee. The Agreement is subject to general contract law, *Musick v. Musick,* 144 Md.App. 494, 501, 798 A.2d 1213 (2002), and whether a contract is ambiguous is a question of law that we review *de novo. Towson Univ. v. Conte,* 384 Md. 68, 78, 862 A.2d 941 (2004).

■ If the contract was ambiguous and extraneous evidence was considered to interpret the ambiguity and discern the parties' intent, that factual determination is reviewed under a "clearly erroneous" standard. *Calomiris v. Woods,* 353 Md. 425, 435, 727 A.2d 358 (1999). And, "[w]hen a provision in a contract is susceptible to more than one interpretation, a construction which makes the contract fair and reasonable will be preferred to one which leads to either a harsh or unreasonable result." *P.V. Props., Inc. v. Rock Creek Village Assocs. Ltd. P'ship,* 77 Md.App. 77, 83, 549 A.2d 403 (1988). "Contract provisions must be viewed in the context of the entire contract rather than construing each term separately." *Id.* at 83–84, 549 A.2d 403.

The Agreement in this case included very broad preliminary language, in which the parties defined their intention in executing the Agreement:

> *[T]he Husband and the Wife are desirous of* amicably adjusting and fully, finally and completely, *settling all rights and obligations arising from the state of matrimony between them, all property rights they may have in the estates of each other ... and all other rights, claims, relationships or obligations between them arising out of their marriage or otherwise ....*

It is evident that this language was intended to effect a disentanglement of all of the parties' assets, to the end that there no longer be any property held jointly. Regarding

appellee's various business interests, his former wife "waive[d] all of her right, title and interest in" those businesses, and, although Italy Italy, Inc. was not the lessee, appellee "assume[d] sole responsibility for all liabilities and expenses *in connection with* the businesses." Finally, the Agreement provided:

> [A]ll property and money received and retained by each party pursuant hereto shall be the separate property of such party, free and clear of any *right, interest or claim of the other party* and each party hereafter shall own, have and enjoy, independently of any claim or right of the other party, all items of real and personal property now or hereafter belonging to him or her, and each party shall have the *right to deal with or dispose* of his or her separate property, both real and personal, as fully and effectively in all respects and for all purposes, *as if the parties had never been married.*

■ Despite the fact that appellee and his former wife could not have more definitively and unequivocally expressed their intent to sever all legal and business ties, nowhere is there any reference in the Agreement to the lease and option to purchase 340 North Frederick Avenue. A contract's silence on a particular issue does not, by itself, create ambiguity as a matter of law, even though silence creates ambiguity when it involves a matter naturally within the scope of the contract. Richard A. Lord, *Williston on Contracts*, § 30.4 at 47–51 (4th ed.1999).

In *Cheyenne Mountain School Dist. No. 12 v. Thompson*, 861 P.2d 711 (Colo.1993), the Supreme Court of Colorado considered whether the employment contract of the School District Superintendent was ambiguous as to whether he was entitled to compensation for his unused vacation time when his contract expired and he chose not to renew it. In finding the terms of the employment contract ambiguous as to the superintendent's entitlement to compensation, the court held:

> The contract is silent on the specific question of whether Thompson is entitled to compensation for unused vacation at

the expiration of his contract. Silence does not by itself necessarily create ambiguity as a matter of law. *Silence does create ambiguity, however, when it involves a matter naturally within the scope of the contract.* Consolidated Bearings Co. v. Ehret–Krohn Corp., 913 F.2d 1224, 1233 (7th Cir.1990). Compensation for unused accrued vacation on expiration of Thompson's contract is a matter naturally within the scope of the contract.

. . . .

Central to this ambiguity is the question of whether to apply paragraph 17 to Thompson's situation. The School District argues that Thompson is not entitled to compensation and urges us to apply paragraph 17 of the contract, which would deny Thompson payment if he had been fired without cause by the School Board. Thompson counters by noting that paragraph 17 only applies to the unilateral termination of the contract by the School Board. *He contends that, because the School Board provided unequivocally for the disposition of vacation compensation in the specific case of unilateral termination, its failure to provide at all for other forms of termination means that it did not intend to deny him vacation compensation in those cases.*

Under the terms of the contract, Thompson's employment could terminate in five ways: (1) by expiration of the term of employment; (2) by discharge for cause; (3) by agreement; (4) by abandonment or breach by Thompson; and (5) by termination without cause. Only for the last, termination without cause, does the contract address the issue of whether Thompson would be compensated for unused vacation time. In that case, paragraph 17 applies and Thompson would not be compensated. The contract does not address the disposition of vacation pay if Thompson's employment terminated in any other way, including where, as here, the contract merely expired.

*Id.* at 715–16 (emphasis added).

The court in *Thompson* having found, *inter alia,* that the employment contract covered such a broad sweep regarding

the terms of the superintendent's employment, concluded that the silence with respect to his entitlement to compensation for unused vacation time created an ambiguity because it involved a matter naturally within the scope of the contract. *See also Consolidated Bearings Co. v. Ehret–Krohn Corp.* 913 F.2d 1224, 1233 (7th Cir.1990) (Although rejecting claim that contract was ambiguous, the United States Court of Appeals for the Seventh Circuit recognized that "Silence creates ambiguity, however, only when the silence involves a matter naturally within the scope of the contract as written.")

■ In the instant case, it is unthinkable, in view of the language agreed to by appellee's former wife in settlement of their affairs, that she intended to sever their rights and obligations with respect to all assets, liabilities and expenses "in connection with the businesses," but somehow did not intend that the broad language include waiver of any interests in the lease and option to purchase 340 North Frederick Avenue. As we have discussed, *supra,* our task in determining whether an ambiguity exists as a matter of law is not to divine the former wife's intention. Rather, we must decide whether the explicit waiver of the wife's interests in the subject lease and option is "a matter naturally within the scope of the contract as written." We hold that it is. Particularly salient is the language of the Preamble to the Separation Agreement referring to the relinquishment of "all property rights they may have in the estates of each other . . ." and the language in the body of the Agreement providing that "each party shall have the right to deal with or dispose of his or her separate property, both real and personal, as fully and effectively in all respects and for all purposes, as if the parties have never been married." We are satisfied that the failure specifically to provide for the relinquishment of any right or interest of appellee's former wife in the subject lease or option to purchase in the context of the global terms of the Separation Agreement constitutes silence that creates an ambiguity.

Accordingly, the circuit court admitted testimony of appellee and his former wife. They testified that it was their

intention, in executing the Separation Agreement, to transfer all rights and liabilities under the lease—including the purchase option—to appellee. Based on the testimony of appellee and his former wife and the 2004 confirmation of their intention, the court resolved the ambiguity by concluding that the parties, in fact, intended to transfer all rights and liabilities under the lease to appellee. Notably, from an equitable standpoint, the protagonist in this appeal is not even a party to the Agreement he assails and is unaffected by whether appellee or appellee and his former wife, jointly, exercise the option, given her confirmation that she, indeed, intended to transfer all of her rights and liabilities under the lease. The circuit court properly determined that the Separation Agreement authorized appellee to unilaterally exercise the option to purchase 340 North Frederick Avenue.

## II

Having established that appellant possessed the option to purchase, the trial court ultimately found that any delay beyond the deadline for closing on the property was occasioned by appellant's own breach, thereby excusing appellee's delay. Appellant does not contend that the encroachment did not exist, nor that the encroachment rendered title unmarketable. Appellant simply contends that, despite his failure to provide marketable title, appellee did not have the right to attempt to clear the cloud on appellant's title beyond the deadline for closing on the property.

Appellant relies in part upon *Chapman v. Thomas,* 211 Md. 102, 126 A.2d 579 (1956), but, in our view, that case actually supports the trial judge's decision. In *Chapman,* Thomas contracted to purchase property from the Chapmans. Under the purchase contract's terms, settlement was to occur no later than thirty days after the contract date. Approximately one week before that deadline, Thomas was informed that the property had been sold for nonpayment of property taxes and that conflicting surveys showed that the recorded boundaries of the two adjacent lots might encroach upon the property.

Thomas's sellers declined to take any action to resolve these clouds on their title, but Thomas persevered and, albeit several months after the putative deadline, Thomas was able to resolve the defects in his sellers' title. Having notified his sellers of the time and place of settlement, Thomas then appeared ready, willing and able to close on the property, but his sellers were not. On these facts, the Court of Appeals held that Thomas's delay was excused because it was occasioned by his sellers' breach and, in dictum, the Court said that the same result would obtain even assuming that time were of the essence. The Court declared, "The vendee is entitled to receive what he bought and is not bound to accept anything short of an unencumbered legal estate in fee." *Id.* at 110, 126 A.2d 579.

Appellant does not discuss the facts of *Chapman* in his brief, but he briefly quotes and emphasizes a brief portion of the Court's opinion. The relevant portion states:

The contract here answers the description of one justifying specific performance. The appellants' argument to the contrary, which we find untenable, is that Thomas did not show himself ready and eager to perform, and was in default for not settling within thirty days. Whether time is or is not of the essence in a contract for the sale of real estate, a purchaser who seeks specific performance has two primary obligations. First he must seek relief with due diligence and show that under all the circumstances he was "ready, desirous, prompt, and eager." Second, if he delays settlement while attempting to have the seller remedy a claimed defect in the title of the property, he must, when it becomes clear the seller will not meet his demands, either accept the title as it is and promptly tender settlement, or cancel the contract.

*Id.* at 108, 126 A.2d 579 (citations omitted). From those statements, appellant distills his conclusion that "Only when a buyer accepts the quality of title the seller has to offer and attempts to *timely* close after those two dates have passed is he entitled to specific performance." In *Chapman*, however, where the buyer's performance (and sellers' nonperformance)

were virtually indistinguishable from the parties' conduct in the case before us, the Court held:

> Thomas' good faith and his sincere intention to take the lots and pay for them was evident from start to finish. As soon as it was clear that the Chapmans would take no action to clear up the matter of the encroachment, Thomas, after very promptly finishing the survey at his expense, immediately offered to take the lots either relying on the last survey as clearing up the encroachment or taking the lots as they were. He made repeated efforts to bring about a settlement and each time was rebuffed by the Chapmans, who were determined not to go through with the contract.
>
> . . . .
>
> The Chancellor found, we think correctly, that Thomas acted in entire good faith and with due diligence, particularly since the Chapmans were aware of the cause of the delay and agreed at first that they would either remove the cause or cooperate in its removal. The delay was not undue and the Chapmans were not hurt by it.

*Id.* at 108–09, 126 A.2d 579; *see also United States v. Bethlehem Steel Co.,* 215 F.Supp. 62, 70–71 (D.Md.1962); *Archway Motors, Inc. v. Herman,* 37 Md.App. 674, 686–87, 378 A.2d 720 (1977) ("The entire delay, without question, was due to appellee, who may not now convert it to his advantage."). We agree with appellee that the trial judge did not err in concluding that appellee's delay was excused by virtue of the fact that the delay was caused by appellant's breach.[2]

### III

■ Next, appellant argues that the trial court erred in concluding that the "as is, where is" clause did not excuse the

---

2. Appellant also argues that the trial court's decision violates the rule against perpetuities, because appellee would have had no time limit within which he had to settle on the property. The argument lacks merit, *see Coe v. Hays,* 328 Md. 350, 362, 614 A.2d 576 (1992), *reversing in part* 88 Md.App. 491, 595 A.2d 484 (1991) (and *see* 88 Md.App. at 504, 595 A.2d 484); *Stewart v. Tuli,* 82 Md.App. 726, 734, 573 A.2d 109 (1990), and in light of these authorities, does not warrant further discussion.

encroachment. Appellant cites no authority supporting his argument, and neither appellee's efforts nor ours have disclosed any Maryland authority on point. Appellant's argument seems to be that if the "where is" portion of his disclaimer does not absolve him of liability for the encroachment, then that phrase will be rendered nugatory.

The brevity of our conclusion is driven by the simplicity of the issues, not the dearth of authority: we hold that appellant's "as is, where is" disclaimer does not operate to nullify his express warranty to provide marketable title. The trial judge found that the encroachment rendered appellant's title unmarketable, while he had contracted to provide marketable title. In fact, accepting appellant's argument would render his warranty of marketable title nugatory.

## IV

As cross-appellant, appellee argues that the trial court erred in declining to award consequential damages resulting from appellant's breach. *See, e.g., Archway Motors*, 37 Md. App. at 688, 378 A.2d 720. We shall not disturb the trial judge's decision, however, because appellee has neither identified the appropriate standard of review, nor explained under that standard how the trial judge erred.

"The determination of whether to award ancillary compensation in equity is ultimately within the sound discretion of the Chancellor." *Bernardini v. Stefanowicz Corp.*, 29 Md.App. 508, 520, 349 A.2d 287 (1975); *see also Montgomery Vill. Assocs. v. Mark*, 95 Md.App. 337, 342–43, 620 A.2d 975 (1993). Appellee has not shown that the trial court's decision was an abuse of discretion and, upon our review, we conclude that it was not.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THREE–FOURTHS BY APPELLANT, ONE–FOURTH BY APPELLEE.**